# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

WILLIE MCCORMICK & ASSOCIATES, INC., a
Michigan corporation,

    Plaintiff,

v.                               Case No. 12-15460

LAKESHORE ENGINEERING SERVICES,
INC., et al.,

    Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTIONS TO DISMISS WITH PREJUDICE

Plaintiff Willie McCormick & Associates, Inc., ("McCormick") brings the present antitrust and RICO action alleging collusion and fraudulent conspiracy between and among Defendants. McCormick places the Defendants in three groups within the conspiracy: (1) The Public Official Defendants;[1] (2) The Ferguson Defendants;[2] and The Contractor Defendants.[3] Its claims arise out of the Detroit Water and Sewerage Department's ("DWSD") award of multiple contracts to the Contractor Defendants. McCormick alleges that these contracts were the product of bid-rigging and unlawful collusion between Defendants, and that because it was an honest subcontractor, it was

---

    [1]Defendants Kilpatrick, Miller, and Mercado.

    [2]Defendants Ferguson, Ferguson's Enterprises, Inc., Xcel, Detroit Management Program JV Team, LLC, Inland/Xcel, LLC, "and other 'proxy' companies acting at Ferguson's direction."

    [3]Defendants Soave, Inland Waters Pollution Control, Inc., Inland/Xcel, LLC, Nafa Khalaf, Detroit Contracting, Inc., Detroit Program Management JV Team, LLC, Avinash Rachmale, Thomas Hardiman, and LakeShore and A & H Contractors, Inc.

effectively excluded from the market. Defendants Anthony Soave, Lakeshore Engineering Services, Inc., Avinash Rachmale, Lakeshore Toltest, Toltest Corporation, Thomas Hardiman, A&H Contractors, Inc., Inland waters Pollution Control, Inc., Inland/XCel, LLC, Detroit Contracting, Inc., Nafa Khalaf, and Detroit Management JV Team, LLC moved to dismiss McCormick's First Amended Complaint. For the following reasons, Defendants' motions to dismiss will be granted.

## I. BACKGROUND[4]

McCormick is an underground water and sewer contractor. Since 1992, it has performed water and sewer-line work almost exclusively for the Detroit Water and Sewerage Department ("DWSD"). Defendants orchestrated a secret bid-rigging scheme whereby water and sewer subcontracts for the DWSD were distributed amongst Defendants. They conspired with each other to rig bids, overcharge the DWSD for services performed on its sewers and water-lines, receive kickbacks, and manipulate DWSD contracts and subcontracts to exclude contractors, such as McCormick, who were not members of the conspiracy. McCormick also claims that Defendants fraudulently concealed their scheme from the authorities and McCormick, and that the extent of the fraudulent activity only became known on December 15, 2010, when the grand jury released the First Superseding Indictment in *United States v. Kilpatrick*, No. 10-20403.

The Public Official Defendants used their authority with the City of Detroit and

---

[4]For the purposes of this order, the court must assume that all of McCormick's factual allegations are true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).

the DWSD to control the award of DWSD contracts, rig the contract bidding process, and steer DWSD contracts to members of the conspiracy. The Ferguson Defendants approached the Contractor Defendants to solicit their agreement to include the Ferguson Defendants as subcontractors on all DWSD bids. The Contractor Defendants agreed to participate in the bid-rigging and to pay kick-backs to the Ferguson and Public Official Defendants in exchange for a monopoly of DWSD contract awards with "little or no supervision" from the DWSD. The ultimate effect of these activities was to steer all DWSD work to members of the conspiracy, thereby insuring that *only* members of the conspiracy would be included as contractors and subcontractors on DWSD contracts, regardless of whether their bid was lowest during the contract bidding process. McCormick claims that but for Defendants' unlawful conspiracy, it would have received contracts and subcontracts from the DWSD.

## II. STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" In order to survive a motion to dismiss, the complaint must allege "[f]actual allegations . . . enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only a complaint that states a plausible claim for relief can survive a motion to dismiss, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Determining whether a complaint states a plausible claim for relief will . . . be

> a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

*Id.* at 679 (internal quotation marks, citation, and brackets and omitted). "In determining whether to grant a [motion to dismiss], the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (quotation marks, citation, and emphasis omitted).

### III. DISCUSSION

#### A. Constitutional Standing

"If Plaintiff[] cannot establish constitutional standing, [its] claims must be dismissed for lack of subject matter jurisdiction." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). In order to satisfy constitutional standing requirements, a plaintiff must show:

> (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (internal quotation marks omitted).

Defendants Soave, Inland Waters, and Inland/Xcel argue that McCormick lacks constitutional standing to bring its claims because McCormick failed to articulate a concrete, particularized, and non-speculative damage as a result of Defendants' alleged

conduct. Defendants assert that McCormick's interest in being selected as a subcontractor on any given contract was a "unilateral hope," and that as a subcontractor McCormick was not entitled to receive any work under any DWSD contracts.

Reasonably read, McCormick's First Amended Complaint alleges that it received subcontractor work from the DWSD before Kilpatrick took office, and that after Kilpatrick began conspiring with the other Defendants to place Ferguson on DWSD contracts, it was excluded from the market. McCormick claims that a combination of bribes, kickbacks, and bid-rigging directly injured its ability to work for the DWSD, and it seeks damages resulting from the unlawful collusion between Defendants. The court finds that McCormick possesses constitutional standing, and will address separately, *infra*, whether McCormick satisfies the individual standing requirements under RICO and antitrust law.

## B. Statute of Limitations

Defendants argue that the four-year statute of limitations period for antitrust and RICO actions bars McCormick's claims. 15 U.S.C. § 15b; *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (adopting four-year statute of limitations for civil RICO actions). McCormick filed its original complaint on December 13, 2012, and does not dispute that many of the actions alleged in its First Amended Complaint took place prior to December 13, 2008.

Instead, McCormick argues that its claims are not time-barred because Defendants' fraudulently concealed the existence of this action.

> Under the doctrine of fraudulent concealment, . . . the plaintiff must allege in the complaint that: (1) the defendant concealed the conduct that constitutes the cause of action; (2) defendant's concealment prevented plaintiff from

5

> discovering the cause of action within the limitations period; and (3) until discovery plaintiff exercised due diligence in trying to find out about the cause of action. The burden of proving the elements of fraudulent concealment is upon plaintiff.

*Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988). A plaintiff is required to prove affirmative acts of concealment. *Id.* at 1472. "[A] plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997). "Fraudulent concealment . . . may be established through the acts of co-conspirators." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008).

McCormick argues that the statute of limitations was tolled until the filing of the First Superseding Indictment in the Kilpatrick case on December 15, 2010. The First Amended Complaint claims that Kilpatrick used his position as Mayor and Special Administrator of the DWSD to manipulate DWSD contracts with no oversight from other city officials. Defendants perjured themselves, tampered with witnesses, and obstructed justice in order to conceal their fraud. (Pg. ID 359–62.) McCormick alleges that Defendants concealed bribes and kickbacks through the use of third-party couriers, company accounts not directly involved in DWSD contracts, and payments to the Public Official Defendants that included private jet flights, hotel rooms, and donations to charities and political campaigns connected with the Public Official Defendants. (*Id.*) McCormick also claims that Defendants used proxy companies as bidding partners, with the understanding that the proxy companies would remove themselves once they received a bid, and that they conducted secret meetings to bring in the Ferguson Defendants as subcontractors on DWSD contracts. (*Id.*)

In response, Defendants argue that a variety of news articles attached to their motions to dismiss demonstrate that inquiry notice existed that possible fraudulent activity was happening in the Kilpatrick mayoral administration as early as 2004. *(See, e.g.,* Pg. ID 715–25, 741–69.) These articles raise questions regarding whether the Kilpatrick administration received campaign money through suspect methods, and whether Ferguson received contracts due to his friendship with Kilpatrick.

Although these articles raise doubts regarding what McCormick knew or should have known regarding its claims, the issue before the court is whether, taken as true, McCormick's allegations allow the court to infer more than the mere possibility of misconduct. Reasonably read, McCormick's allegations allege a scheme of fraudulent conduct that was deliberately concealed from the outside world. McCormick alleges that it did not become aware of the nature or extent of the conspiracy until after the federal government released an indictment detailing the results of its lengthy investigation into the Kilpatrick administration. The court finds that McCormick has reasonably plead fraudulent concealment.[5]

### C. Antitrust Claims

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to

---

[5]Defendants Inland Waters and Inland/Xcel argue separately that McCormick's action against them is barred because McCormick agreed to a two-year period of limitations in two subcontractor agreements (CS-1368 and DWS 876/77). McCormick denies that either agreement produced by the Inland Defendants pertains to this action, and it represents that the alleged activity in its First Amended Complaint took place prior to June 1, 2006. Because it is unclear whether either agreement pertains to the instant case, the court declines to decide the issue.

be illegal." 15 U.S.C. § 1. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). McCormick alleges that Defendants violated the Sherman Act in two ways: (1) by conducting bid-rigging activity, and (2) by horizontal market allocation and exclusion. However, because McCormick lacks standing to proceed on its antitrust claims, the court does not reach either issue.

Antitrust standing is distinct from constitutional standing. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (*en banc*). In order to establish antitrust standing, McCormick must allege an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Far from being a mere technicality, antitrust standing is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws by claimants[.]" *NicSand*, 507 F.3d at 449. "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).

McCormick alleges that as a result of Defendants' conspiracy, it did not receive subcontracts with the DWSD that it would have received if there had not been a conspiracy. Simply put, Kilpatrick's requirement that Ferguson be a member of all

DWSD contracts mandated that only co-conspirators would receive work from DWSD—all honest subcontractors were barred from the market. Assuming that the bid-rigging scheme McCormick describes is unlawful, it is not clear that McCormick's injury flows from the alleged antitrust violation. This is because "antitrust laws . . . were enacted for the protection of *competition not competitors*." *Brunswick Corp.*, 429 U.S. at 488 (emphasis added).

The Sixth Circuit rejected a similar antitrust claim in *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336 (6th Cir. 2006). In *Expert Masonry*, the plaintiff company bid on two public construction projects and failed to win either. It brought suit against the winning contractor as well as the government entity which awarded the contract, claiming that the two unlawfully conspired with each other to rig the bidding process. *Id.* at 338–341. The Sixth Circuit noted that "[i]t is clear that the injury alleged here has not been previously found to be a cognizable antitrust violation under the Sherman Act in analogous situations." *Id.* at 346. The court recognized the danger of allowing such a suit to proceed:

> To allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition and salesmanship, for companies and their staffs could not reasonably be expected to compete to win sales, projects, and new clients if, in so doing, they risk treble damages and even imprisonment when one rival is disappointed with the results.

*Id.* at 347–48. The court held that the plaintiff did not allege an injury that antitrust laws protect, and "declin[ed] to extend antitrust liability to give succor to dejected buyers or sellers who . . . allege that one buyer and one seller colluded to reach a deal that may or may not have been inferior to the deal offered by the disappointed party." *Id.* at 348.

9

Taking the allegations in the First Amended Complaint as true, Defendants conspired to rig bids for DWSD contracts for their mutual benefit. Ferguson and the Public Official Defendants received kickbacks and payment for work they did not complete, and the Contractor Defendants received the opportunity to conduct business with the DWSD. Although it may be true that McCormick missed out on work with the DWSD because of the conspiracy, this is not the type of injury that makes bid-rigging unlawful under antitrust law. Rather, bid-rigging is illegal because it increases the price of products to consumers. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013.) In the scheme that McCormick describes, the DWSD was the consumer. The direct harm in this case is to the DWSD which had to pay increased prices for its work as a result of fraudulent activity by Ferguson, Kilpatrick, and the General Contractors who colluded in the fraud. In contrast, McCormick's injury stems from its exclusion from DWSD contracts, and is thus better stated as a harm to a competitor, rather than to competition itself.

Even assuming that McCormick is able to allege an antitrust injury, its complaint may not proceed if "[o]ther relevant factors—the nature of [McCormick's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and [McCormick's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement." *Associated Gen. Contractors of Cal., Inc., v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983). The *Associated General Contractors* factors are balanced, and no single factor is outcome determinative. *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d

972, 976 (6th Cir. 2000).

The Second Circuit's decision in *Gatt* is instructive. Gatt Communications, Inc., bought, marketed, and sold commercial land mobile radios in New York State. The defendant, PMC Associates, Inc., was a dealer and sales representative for Vertex Standard USA, Inc., a manufacturer and distributor of radios. *Gatt*, 711 F.3d at 71. Gatt claimed that PMC and another sales representative, Wineland, orchestrated a bid-rigging scheme whereby they determined in advance which Vertex dealer would submit the lowest bid for each government contract. This created the illusion of a competitive bidding process, but insured that the result would be predetermined by the bidding parties. *Id.* at 72. After participating in this scheme for approximately two years,[6] Gatt became dissatisfied with the arrangement, and "broke ranks and independently set and submitted a quotation, despite PMC's instruction to the contrary." *Id.* at 73. Vertex terminated Gatt as a distributor and PMC won the contract. *Id.* at 73–74.

The Second Circuit found that the *Associated General Contractors* factors weighed against granting Gatt antitrust standing. First, Gatt's injuries were indirect as it claimed commissions that it would have otherwise earned if it had remained a Vertex distributor. The court found these lost commissions more remote and speculative than the losses suffered by the government agencies that paid inflated prices for Vertex's products. *Id.* at 78–79. Further, the court noted that the state agencies were a more

---

[6]McCormick argues that unlike the plaintiff in *Gatt*, McCormick was never a member of the fraudulent scheme. However, the *Gatt* court expressly declined to consider whether the equitable doctrine of *in pari delicto* barred Gatt's claims, and did not rely in substantial part on Gatt's involvement in the conspiracy in determining that it lacked antitrust standing. *See Gatt*, 711 F.3d 80–81.

11

direct plaintiff to bring suit. *Id.* at 79; *see also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 269 (1992) ("directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."). The Second Circuit rejected Gatt's allegations that had it been able to submit competitive bids, it would have received more government contracts as speculative. *Gatt*, 711 F.3d at 79. The court noted that, presumably, other contractors would have also submitted bids and there was no reason to assume that Gatt would win the contracts over these other competitors. The presence of these other competitors also increased the potential for duplicative recoveries, as the court noted that other Vertex dealers would be able to file suit alleging that had their bids not been restrained, they too could have won government contracts. *Id.* at 79–80.

Similarly, the *Associated General Contractors* factors weigh against granting McCormick standing. McCormick claims indirect injuries for sub-contracts that it would have earned had there been no conspiracy between Defendants. But like *Gatt*, the direct injury in this case is to the government agency which paid inflated prices for its contracts with Defendants. *See West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010). The DWSD is a better-situated plaintiff to bring suit against Defendants. McCormick's allegations that it would have been granted sub-contracts were it not for Defendants' conspiracy is speculative as there is no reason to believe that it would have won these sub-contracts over other competitors. *See Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) (rejecting as too speculative claims by developer that were it not for unlawful collusion, it would have received a redevelopment contract).

Lastly, the potential for duplicative recoveries in this suit would be great as other sub-contractors could plausibly bring suit alleging similar antitrust violations, thereby complicating the calculation and apportionment of damages. *Holmes*, 503 U.S. at 269 ("[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.").

McCormick offers no meaningful argument to the contrary. Aside from supplying the appropriate standard for evaluating antitrust standing (discussed *supra*), McCormick does not cite any case finding antitrust standing in similar circumstances. Addressing the *Associated General Contractors* factors, McCormick emphasizes that as a subcontractor, it was Ferguson's direct competitor and that it was replaced on several DWSD contracts in order to make room for Ferguson. However, McCormick concedes the existence of other subcontractors who may have been similarly displaced, thus supporting Defendants' argument that damages would be difficult to calculate. And although McCormick tries to downplay the indirect nature of its injury, the First Amended Complaint is clear that the DWSD was directly damaged as a result of the conspiracy through inflated rates for DWSD contracts and kick-backs to the Public Official Defendants. Thus, the court finds that McCormick is not able to allege an injury protected by antitrust laws, and therefore does not have standing to proceed on counts II and III of its First Amended Complaint.

### D. RICO Claims

The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides:

It shall be unlawful for any person employed or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Individual plaintiffs are permitted to bring civil RICO enforcement actions, with the threat of treble damages and attorneys' fees if they are successful. *Id.* at § 1964(c). In order to state a claim under civil RICO, McCormick must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Because Congress modeled § 1964(c) on the civil-action provision of federal antitrust laws, courts frequently turn to antitrust jurisprudence when analyzing the scope of civil RICO. *See Holmes*, 403 U.S. at 267; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). Congress passed RICO with intentional broad effect; nevertheless, "RICO's breadth is not boundless." *Compare Sedima*, 473 U.S. at 499 ("[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."), *with Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 563 (6th Cir. 2013) (*en banc*).

Under civil RICO, plaintiffs must allege an injury to its "business or property." *Sedgwick*, 731 F.3d at 563–64. Courts look to state law to determine whether an alleged injury is an injury to business or property, but federal law retains restrictive significance in order to promote a uniform definition of "business or property" throughout the country. *Id.* at 565. A failure to allege a direct relationship between the claimed predicate acts and the resulting injury to business or property is fatal to a RICO claim. *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010).

14

McCormick's allegations can be divided into two categories: (1) allegations concerning contracts of which McCormick was never a subcontractor, and (2) contracts of which McCormick was a subcontractor. For the first category (specifically, contracts CS-1368,[7] DWS 638, DWS 864, and DWS 865), McCormick argues that Defendants' unlawful collusion prohibited it from being awarded subcontractor work. It claims that it was unable to compete for the subcontractor work because it was not a member of the conspiracy, and that had the bidding been conducted on a fair and equitable basis, it would have received subcontractor work for these DWSD projects. But McCormick also concedes that it was never actually awarded subcontractor work under any of these contracts, thus basing its claim on the expectation that having completed subcontractor work for the DWSD in the past, it would receive subcontractor work from the DWSD in the future. This expectation of future contracts is not enough to grant McCormick RICO standing.

McCormick's strongest argument under this first category of contracts is for CS-1368, a contract for which Inland was the general contractor. McCormick alleges that the DWSD Board initially approved it as a subcontractor on CS-1368, but that Kilpatrick, who was Special Administrator of the DWSD, refused to grant his final approval of Inland's contract until Inland utilized a Ferguson company as a subcontractor. (Pg. ID 342.) Once Inland replaced McCormick with Ferguson Enterprises, Kilpatrick approved CS-1368. (Pg. ID 344.) However, this substitution does not demonstrate that McCormick had a protected business or property interest in the anticipation that it would

---

[7]The court notes that McCormick alleges that it performed "isolated work" on CS-1368 on an "emergency[-]needs" basis. *Id.* at 347.

15

be a subcontractor on CS-1368. Indeed, Michigan and Sixth Circuit law provide to the contrary. *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architechs & Planners Inc.*, 821 N.W. 2d 1, 3 (Mich. 2012) ("[A] disappointed low bidder on a public contract has no standing to sue in order to challenge the award of a contract to another bidder."); *Talbot Pav. Co. v. City of Detroit*, 67 N.W. 979, 980 (Mich. 1896) ("[N]o case can be found holding the lowest bidder, whose bid has been rejected, to have a right to an action at law to recover his profits."); *EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 352–53 (6th Cir. 2008) ("Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract. We agree, and note that holding otherwise would give any low responsive bidder an immediate business expectancy in the government contract at issue.").

If McCormick is allowed to bring RICO claims based on the fact that it was listed on, but never received, contracts, it would be based on a new expectancy interest that would cloud negotiations between parties. Plaintiffs would be able to bring RICO actions based on allegations that they were at one time the top bidder for a given contract and that the sole reason they did not end up as the ultimate contractor for a project is because of fraudulent collusion between the parties. Such a holding would expand RICO liability and cloud markets with uncertainty stemming from the threat of treble damages.

Regarding the second category of contracts, that is contracts for which McCormick alleges that it was a subcontractor (CM 2014 and CM 2015), McCormick encounters a different problem. For these contracts, McCormick alleges that it was a subcontractor on the projects, but that as a result of collusion between Defendants, it

received harder and less profitable work, with the easiest and most profitable work being granted to Ferguson and his proxies. (Pg. ID 351–55.) This is speculation of a different sort. Putting aside the question of whether McCormick has a protected property interest in better, easier, and more profitable work on the contracts, it is unclear how it would prove that Defendants' collusion proximately caused it to receive less, more difficult, and lower quality work. There are any number of valid reasons that might explain why McCormick did not receive more and "better" work under the contracts, including: logistical concerns on the ground, relative expertise of the parties, daily needs of the project at hand, and competitiveness of McCormick's bid as compared with other subcontractors on the project.

Examination of these issues would require inquiry into the parties' business judgment, a task for which the court is not well-suited. For example, in *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396 (7th Cir. 2006), the plaintiff construction company alleged that the defendants participated in bid-rigging activity and caused the plaintiff to lose contracts with the Wisconsin Department of Transportation. *Id.* at 398–99. The Seventh Circuit rejected the plaintiff's RICO claim as too speculative:

> A court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.' It is entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime.

*Id.* at 403 (quoting *Anza*, 547 U.S. at 458). "Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of . . . [unlawful racketeering]." *Anza*, 547 U.S. at 459. Although it has intuitive appeal, the nature of McCormick's claim is vague

17

and speculative. What constitutes "better" work on a sewer maintenance and construction project? Is it the speed of completion that matters, or merely the profitability of the completed project? Or is it some combination of the above factors? The court is unable to answer these questions, nor can it—they are entirely subjective and speculative, and not a protected interest under RICO.

Underlying McCormick's entire claim is the fact that it is *not* the most directly injured party in First Amended Complaint. Rather, as discussed *supra*, the DWSD was directly injured by Defendants' alleged fraud. According to the allegations in the First Amended Complaint, the DWSD suffered increased rates as a result of the fraudulent kickbacks to the Ferguson and Kilpatrick. Its contract prices were inflated, and it was robbed of honest competition in its bidding process due to collusion between Defendants. In contrast, McCormick's injury is attenuated and indirect. *See Anza*, 547 U.S. at 458; *James Cape*, 453 F.3d at 404. Thus, the court grants Defendants' motion to dismiss count I of the First Amended Complaint.

## IV. CONCLUSION

McCormick lacks antitrust and RICO standing to bring its claims. Accordingly, IT IS ORDERED that Defendants' motions to dismiss McCormick's First Amended Complaint [Dkt. ## 51, 53, 54, 67] are GRANTED and counts I–III of the First Amended Complaint [Dkt. # 33] are DISMISSED WITH PREJUDICE as to Defendants Anthony Soave, Lakeshore Engineering Services, Inc., Avinash Rachmale, Lakeshore Toltest, Toltest Corporation, Thomas Hardiman, A&H Contractors, Inc., Inland Waters Pollution Control, Inc., Inland/XCel, LLC, Detroit Contracting, Inc., Nafa Khalaf, and Detroit Management JV Team, LLC. Counts I–III remain as to non-moving Defendants Kwame

18

Kilpatrick, Victor M. Mercado, Derrick A. Miller, Bobby W. Ferguson, Ferguson's Enterprises, Inc., and Xcel Construction Services, Inc.

IT IS FURTHER ORDERED that Defendants Anthony Soave, Lakeshore Engineering Services, Inc., Avinash Rachmale, Lakeshore Toltest, Toltest Corporation, Thomas Hardiman, A&H Contractors, Inc., Inland Waters Pollution Control, Inc., Inland/XCel, LLC, Detroit Contracting, Inc., Nafa Khalaf, and Detroit Management JV Team, LLC, are DISMISSED from this action.

                                                s/Robert H. Cleland
                                                ROBERT H. CLELAND
                                                UNITED STATES DISTRICT JUDGE

Dated: December 20, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 20, 2013, by electronic and/or ordinary mail.

                                                s/Lisa Wagner
                                                Case Manager and Deputy Clerk
                                                (313) 234-5522